IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TODD D. STOVER,

      Plaintiff,

v.                                 Civil Action 2:17-cv-547
                                     Chief Judge Edmund A. Sargus, Jr.
                                     Magistrate Judge Jolson

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff, Todd D. Stover, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his Title II Social Security Disability Benefits and Title XVI Supplemental Security Income Disability applications. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

I. BACKGROUND

    A. Prior Proceedings

Plaintiff filed applications for Title II Social Security Disability Benefits and Title XVI Supplemental Security Disability Benefits on July 30, 2013, and August 5, 2013, respectively, alleging disability since May 24, 2012. (*See* Doc. 8, Tr. 76–105, PAGEID #: 114–43). Plaintiff's claims were denied initially on November 20, 2013 (*id.*, Tr. 136–142, PAGEID #: 174–80), and upon reconsideration on February 24, 2014 (*id.*, Tr. 147–53, PAGEID #: 185–91). He filed a Request for Hearing on March 20, 2014. (*Id.*, Tr. 158–59, PAGEID #: 196–97).

Administrative Law Judge Christopher Tindale (the "ALJ") held an administrative

hearing by videoconference on December 3, 2015. (*Id.*, Tr. 42, PAGEID #: 80). On April 19, 2016, the ALJ issued an unfavorable decision. (*Id.*, Tr. 21, PAGEID #: 59). Plaintiff requested review of the administrative decision to the Appeals Council (*id.*, Tr. 20, PAGEID #: 58), which denied his request on April 27, 2017, and adopted the ALJ's decision as the Commissioner's final decision (*id.*, Tr. 1, PAGEID #: 39).

Plaintiff filed this case on June 23, 2017 (Doc. 1), and the Commissioner filed the administrative record on September 8, 2017 (Doc. 8). Plaintiff filed a Statement of Specific Errors (Doc. 9), the Commissioner responded (Doc. 11), and Plaintiff filed a Reply (Doc. 12).

### A. Relevant Testimony at the Administrative Hearing

Plaintiff testified that he was 5'8" and weighed 190 pounds, although he indicated that his weight fluctuates frequently based on his diabetes. (Doc. 8, Tr. 48, PAGEID #: 86). Plaintiff explained that his last job was at Special Metals, where he worked as a spot grinder, but his "hands kept getting number [sic], and [he] couldn't even hold onto the grinder." (*Id.*, Tr. 51, PAGEID #: 89). Because of the problems with Plaintiff's hands, Dr. James R. Bailes, Jr. M.D., wrote him a "light duty excuse" to return to work, but Special Metals said they could not accept that excuse, as there were no light duty jobs available. (*Id.*, Tr. 52, PAGEID #: 90). Consequently, Plaintiff was terminated. (*Id.*).

In terms of his diabetes, Plaintiff testified that he has struggled to maintain his sugar levels, and has utilized insulin pumps and insulin shots for treatment. (*Id.*, Tr. 53, PAGEID #: 91). At the hearing, Plaintiff stated that he recently returned to using an insulin pump:

> Plaintiff: I've had a lot of ups and downs with my sugar. It's, it's got a sensor built in that's not working very well for me, and it doesn't seem to be very accurate.

> Attorney: How so? What's going on with the sensor? What's it telling you?
>
> Plaintiff: Well, they said that because of the amount of time that I wore the pump before, and that I took shots, I have extensive scar tissue around the areas that I can put the sensor, and it doesn't read as well when it's in scar tissue, I guess. But it just, it doesn't give me an accurate reading.
>
> Attorney: How far off has it been?
>
> Plaintiff: Well, the other day my sugar was 45, and the meter said it was 100. So I mean it was, I was about to go down. And according to that meter, it was saying I was fine.

(*Id.*, Tr. 53–54, PAGEID #: 91–92).

Plaintiff also testified that his low sugar levels cause him to experience hypoglycemic episodes, which he refers to as "seizures." (*Id.*, Tr. 49, 54, PAGEID #: 87, 92). According to Plaintiff, his license was suspended as a result of one of these seizures. (*Id.*, Tr. 49, PAGEID #: 87). Plaintiff experienced several of these seizures in 2011 and 2012, and his most recent episode occurred six or seven months before the hearing: "I was walking to the field at my father's house trying to go get my kids, and I just collapsed. And whenever I woke up, they were stuffing ice cream in my mouth and trying to get sugar in me. I had bitten my tongue really bad." (*Id.*, Tr. 54, PAGEID #: 92). Plaintiff explained that when he experienced the seizures he would often bite his tongue and "wake up with a severe headache, and [not be able to] remember what's happened at all." (*Id.*, Tr. 54–55, PAGEID #: 92–93).

Plaintiff also testified that he first experienced neuropathy connected to his diabetes in 2011, with "just a little bit of numbness in [his] hands and feet." (*Id.*, Tr. 55, PAGEID #: 93). Plaintiff explained that it kept getting worse and it "got[] to the point where it felt like someone was tying ropes around my limbs, and just pulling them tight until I just couldn't feel my hands and feet anymore." (*Id.*). Plaintiff experienced this pain every day and was unable to take the

3

typical medicine prescribed to treat the pain because of his low blood sugar. (*Id.*, Tr. 55–56, PAGEID #: 93–94). Instead, Plaintiff was prescribed Lyrica, but it gave him severe heartburn, indigestion, and he experienced no relief. (*Id.*, Tr. 56, PAGEID #: 94). Unable to get relief, Plaintiff turned to methadone:

> I went to Dr. Bales [sic]. He had gave me the nerve pain relief medicine that didn't work. I couldn't get help anywhere. I ended up going to a methadone clinic in Huntington. And I went there for quite some time, and then got addicted to the methadone...Dr. Bales [sic] didn't like the fact that I was taking it, so they suggested that I get off of that. So that's when I, I went to a doctor to get off the methadone treatment.

(*Id.*).

Plaintiff testified that following carpal tunnel surgery in 2013, his neuropathy in his hands improved although he was still experiencing neuropathy in his feet. (*Id.*, Tr. 57, PAGEID #: 95). He stated that it felt "like somebody had untied whatever was around my wrist. I mean it did help for awhile." (*Id.*). However, Plaintiff stated that his hands started to bother him again and he developed trigger finger in several fingers. (*Id.*, Tr. 58, PAGEID #: 96). More specifically, Plaintiff stated that he was experiencing pain, numbness and tingling in his hands daily. (*Id.*, Tr. 58–59, PAGEID #: 96–97).

In terms of the limitations caused by Plaintiff's hand issues, he testified there is very little he can pick up, and his children have to help him "do a lot of things around the house." (*Id.*, Tr. 59, PAGEID #: 97). Plaintiff's children carry the clothes for the laundry while he shows his son "what buttons to hit," and they also aid him in cooking. (*Id.*). Further, Plaintiff explained that he will "lose grip on [things] without even realizing it." (*Id.*, Tr. 61, PAGEID #: 99). While Plaintiff is able to zip his pants, he doesn't "wear any kind of shirts that require [him] to actually button them or unbutton them to take them off." (*Id.*, Tr. 61, 66, PAGEID #: 99, 104). He stated

4

that he "lost the thimbleness [sic] or whatever it's call [sic] in [his] fingers to, to be able to do any kind of intricate things." (*Id.*, Tr. 61, PAGEID #: 99).

As a result of the neuropathy in Plaintiff's feet, he testified that he cannot keep shoes on because it "makes it start burning worse. It just feels like, it feels like I have a rope around my ankle or something, just cutting off, it feels like it's cutting off circulation to my feet." (*Id.*, Tr. 59–60, PAGEID #: 97–98). Plaintiff further stated that he can stand for five to ten minutes before he needs to sit down, and he can walk about 150 feet without sitting down. (*Id.*, Tr. 60, PAGEID #: 98). On a typical day, he will get up with his children, "try to help them get their school clothes picked out and on, sit around with his dad and his dad's fiancé, read, and cook dinner with his children. (*Id.*, Tr. 64–66, PAGEID #: 102–04).

A Vocational Expert (the "VE") also testified at the hearing, stating a hypothetical person of Plaintiff's age, education, work history, with his residual functional capacity ("RFC") was unable to perform Plaintiff's past work, but could perform unskilled, light work, such as an inspector, mail clerk, and routing clerk. (Tr. 71, PAGEID #: 109). The VE also testified that, if the hypothetical person's exertional level was reduced to sedentary, he could perform jobs such as inspector and bench assembler. (Tr. 71–72, PAGEID #: 109–10).

The VE testified concerning additional limitations as follows:

> Q. [I]f I was to increase the limitation in handling and fingering to occasional, would there be any jobs that the individual could perform?
>
> A. No, sir. That would be work preclusive, and that is per the DOT.

(*Id.*, Tr. 73, PAGEID #: 111).

### B. Relevant Medical Background

Plaintiff began seeing Dr. James R. Bailes, Jr. M.D., when "he was diagnosed with type 1

diabetes as a teenager." (Doc. 8, Tr. 484, PAGEID #: 522). Indeed, the record includes treatment notes from Dr. Bailes that document Plaintiff's numerous appointments from May 6, 2012 until January 20, 2016, for what was described as "diabetic visits" or "diabetic follow-ups." (*Id.*, Tr. 491, 493–500, 589, 600–05, PAGEID #: 529, 531–38, 627, 638–643).

In a letter dated October 24, 2014, Dr. Bailes explained Plaintiff's condition:

> Todd developed severe diabetic neuropathy many years ago and unfortunately has been unable to work for the last several years. He has severe carpal tunnel syndrome and has had surgery to try to correct this. Todd has profound weakness in his grip and strength in his hands and poor sensation. He is unable to perform any activities with his hands that require any dexterity. Todd also has diabetic neuropathy affecting his legs. He is limited in how long he can stand because of his diabetic neuropathy. Todd also has decreased overall strength. He has wide fluctuations in his blood sugar and experiences hypoglycemic unawareness. He is unable to tell if his blood sugars are low. He does have very wide fluctuations in his blood sugar.

(*Id.*, Tr. 484, PAGEID #: 522). Dr. Bailes concluded his letter by stating that he believed Plaintiff "could perform in a job where he was giving advice over the phone as long as he had the ability to take breaks every hour or two." (*Id.*). However, Dr. Bailes emphasized that Plaintiff could not "perform with regularity any physical or manual labor." (*Id.*).

Attached to Dr. Bailes' letter was a Medical Source Statement, in which he opined that Plaintiff could occasionally carry 1 to 5 pounds and rarely carry 6 to 10 pounds. (*Id.*, Tr. 485, PAGEID #: 523). Further, he stated that Plaintiff could frequently reach/extend with either arm or hand, but could not perform any handling—such as seizing, grasping, or turning—with either hand, and could only rarely perform fingering activities like picking or pinching. (*Id.*, Tr. 485–86, PAGEID #: 523–24). In terms of postural limitations, Dr. Bailes stated that in an eight-hour work day, Plaintiff could stand 1-2 hours, walk 1-2 hours total, and sit 2-4 hours total, although breaks would need to be taken. (*Id.*, Tr. 486, PAGEID #: 524). Finally, Dr. Bailes checked the

6

box stating Plaintiff's condition would not deteriorate if placed under stress associated with a job and he did not believe Plaintiff would have partial or full day unscheduled absences more than five days per month. (*Id.*, Tr. 487, PAGEID #: 525).

In April 2013, Plaintiff sought treatment from Dr. H. Francis Farhadi for hand pain and numbness in both hands. (*Id.*, Tr. 386, PAGEID #: 424). Treatment notes from an April 3, 2013 appointment state that Plaintiff's bilateral hand pain, numbness, and tingling started several years prior, the symptoms had worsened over the years, and Plaintiff experienced hand problems constantly. (*Id.*, Tr. 387, PAGEID #: 425). A previous EMG nerve conduction study indicated "bilateral median nerve neuropathy at the wrists (carpal tunnel syndrome), grade III, moderate-to-severe." (*Id.*, Tr. 390, PAGEID #: 428). "Given the severe and unremitting nature of his symptoms," Dr. Farhadi determined that surgery was a reasonable option. (*Id.*).

Consequently, Plaintiff underwent left carpal tunnel decompression on April 16, 2013 (*id.*, Tr. 393, PAGEID #: 431), and right carpal tunnel decompression on May 7, 2013 (*id.*, Tr. 398, PAGEID #: 426). At his one-week post-operative appointment for his left hand, Plaintiff reported that he was doing well and "wishe[d] to return to work and his normal activities soon," but "noted intermittent episodes of hand discomfort." (*Id.*, Tr. 394, PAGEID #: 432). Similarly, Plaintiff reported improvement at his one-week post-operative appointment for his right hand, but reported incisional pain that was unrelieved with pain medication. (*Id.*, Tr. 398, PAGEID #: 436).

On October 22, 2013, Plaintiff saw Dr. Deidre Parsley for an internal medicine examination. (*Id.*, Tr. 451, PAGEID #: 489). Dr. Parsley noted that Plaintiff had been hospitalized multiple times due to his diabetes; the last time being in 2012. (*Id.*; *see also id.*, Tr.

7

307, PAGEID #: 345 (Plaintiff was admitted to the ER on March 27, 2012, following an episode of hypoglycemia that led to a "syncopal episode")). Plaintiff reported that even though he had undergone bilateral median nerve releases earlier in the year, he had "difficulty holding onto objects, gripping, and he tends to drop objects." (*Id.*). At the time, Plaintiff denied numbness or tingling in his hands, but reported numbness and tingling in both feet. (*Id.*, Tr. 451, 456, PAGEID #: 489, 494).

An examination by Dr. Parsley of the hands revealed tenderness of all joints, but no redness, warmth, or swelling. (*Id.*, Tr. 454, PAGEID #: 492). Dr. Parsley opined that Plaintiff's "grip strength was equal and symmetrical but slightly decreased and rated 4/5 bilaterally," and noted that Plaintiff could write with his dominant hand and pick up coins with either hand. (*Id.*, Tr. 454, 456, PAGEID #: 492, 494). Dr. Parsley also noted that Plaintiff's "grip strength measure[d] 10, 6 and 2 kg of force on the right and 6, 4 and 4 kg of force on the left." (*Id.*, Tr. 454, PAGEID #: 492). Plaintiff had decreased sensation to pinprick, light touch, and vibration of the bilateral feet. (*Id.*, Tr. 456, PAGEID #: 494). Ultimately, Dr. Parsley stated that Plaintiff's "ability to perform work-related activities appears to be at least moderately impaired" and he had "a mild impairment in grasping, gripping, handling objects with the hands, and lifting[.]" (*Id.*, Tr. 457, PAGEID #: 495).

One week after seeking Dr. Parsley, Plaintiff was referred by the Ohio Division of Disability Determination to Dr. Richard E. Sexton for a psychological evaluation. (*Id.*, Tr. 442, PAGEID #: 480). In his report, Dr. Sexton stated:

> Regarding gross motor abilities, the claimant reported problems with moving his arms, hands, and fingers, bending over, and lifting and carrying. His understanding of the purpose of the present examination was good, as was his level of motivation to participate. There was no tendency on his part to

8

exaggerate or minimize/deny signs or symptoms of emotional distress.

(*Id.*, Tr. 445, PAGEID #: 483). Dr. Sexton also noted that Plaintiff "did not show significant inconsistencies in self-reported information over the course of the interview" and that "[h]is self-report data appeared to be reliable." (*Id.*, Tr. 447, PAGEID #: 485). Ultimately, Dr. Sexton opined that Plaintiff appeared to be suffering from a Dysthymic Disorder and an Anxiety Disorder Not Otherwise Specified. (*Id.*).

On February 23, 2014, Dr. Donald Woodard completed a medical report stating that Plaintiff's diagnoses included, *inter alia*, IDDS (insulin-dependent diabetes mellitus), LTS with neuropathy, and arthritis. (*Id.* Tr. 470, PAGEID #: 508). Dr. Woodard opined that Plaintiff had trouble with hands and wrists, had decreased motor functions of his hands with severe pain, and his ability to lift, grasp and work above his head were limited. (*Id.*, Tr. 470–71, PAGEID #: 508–09).

### C. The ALJ's Decision

The ALJ found that Plaintiff suffered from the following severe impairments: diabetes mellitus with neuropathy, carpal tunnel syndrome, rheumatoid arthritis, seizures, obesity, mood disorder, anxiety disorder, and attention deficit disorder. (Doc. 8, Tr. 26, PAGEID #: 64). The ALJ held, however, that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing. (*Id.*, Tr. 27, PAGEID #: 65).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with the following limitations: he can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. *He can frequently handle and finger bilaterally.* He must avoid all exposure to hazards, unprotected heights, and dangerous machinery. He cannot perform jobs that

require driving. Mentally, the claimant is limited to simple, routine, repetitive tasks.

(*Id.*, Tr. 29, PAGEID #: 67) (emphasis added). In reaching this decision, the ALJ stated that the "objective medical evidence of record [was] inconsistent with the claimant's subjective allegations of pain and limitation." (*Id.*, Tr. 30, PAGEID #: 68).

In terms of weight given to the physicians, the ALJ assigned "significant weight" to the state agency consultants Dr. Leigh Thomas and Dr. Gerald Klyop, who stated that Plaintiff could perform light work with frequent handling and fingering. The ALJ stated that their opinions were "overall consistent with the record, including the examination findings and reports of improvement." (*Id.*, Tr. 33, PAGEID #: 71). Some weight was given to Dr. Woodard's opinion that Plaintiff's ability to lift, grasp, and work overhead were limited. (*Id.*). According to the ALJ, Dr. Woodard's opinion was "vague and did not correlate to specific functional limitations," but nonetheless, his opinion was found by the ALJ not to be inconsistent with the RFC. (*Id.*). Dr. Parsley's opinion was found to be "vague and [d]id not correlate to specific functional limitations; however, it [was] not entirely inconsistent with the [] RFC and [was] thus given some weight" by the ALJ. (*Id.*, Tr. 33–34, PAGEID #: 71–72).

Finally, the ALJ declined to give controlling weight to Dr. Bailes:

Little weight is given to James Ballas [sic], Jr., M.D., who wrote a letter dated October 29, 2014 in which he opined the claimant could perform a job where he was giving advice over the phone as long as he had the ability to take breaks ever hour or two (9F/3). He added the claimant could not perform with regularity or (sic) any physical or manual labor (*Id.*). He completed a Medical Source Statement in which he opined the claimant could occasionally lift up to 5 pounds, rarely lift up to 10 pounds frequently reach bilaterally, never handle, rarely finger, stand 1–2 hours, walk 1–2 hours, sit 2–4 hours, occasionally bend, squat, crawl, and climb steps, and never climb ladders (*Id.* at 45). Dr. Ballas' [sic] opinion appears to be based on subjective reports and not objective evidence, which shows relatively normal physical and neurological findings and improvement in

10

>functioning. His limitations, particularly the handling and fingering limitations, are extreme and inconsistent with the claimant's activities of daily living and with the medical evidence of record, including the consultative internal medicine examination findings.

(*Id.*, Tr. 33, PAGEID #: 71).

The ALJ reiterated his finding that the alleged severity of Plaintiff's impairments were inconsistent with his own reports of activities of daily living, while noting that Plaintiff "remains fairly active, as he is able to care for his children and assist with household chores." (*Id.*, Tr. 32, PAGEID #: 70). Further, the ALJ relied on the fact that Plaintiff states that he reads, listens to music, occasionally visits with friends, is able to maintain personal care, grocery shop, can manage personal finances, and attends church, as evidence to suggest he is not as limited as alleged. (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff asserts the following assignments of error: (1) the ALJ failed to properly evaluate the opinion of his treating physician, Dr. James Bailes; (2) the residual functional capacity determination is not supported by substantial evidence; and (3) the ALJ failed to recognize and consider Plaintiff's visual impairment as a medically determinable impairment. (Doc. 9).

### A. Treating Physician

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Plaintiff argues that the ALJ erred in this two-step analysis because the reasons given for assigning Dr. Bailes' opinion only "little weight"—specifically, that it was based only on subjective evidence and not consistent with the medical record or Plaintiff's daily activities—were inaccurate. (*See* Doc. 9 at 5–10). The Court agrees.

First, contrary to the ALJ's conclusion, the objective record evidence does in fact support Dr. Bailes' opinion. Dr. Bailes' treatment notes spanning several years demonstrate Plaintiff's continuing difficulties with his Type 1 diabetes and document a history of diabetic neuropathy. (*Id.*, Tr. 491, 493–500, 589, 600–05, PAGEID #: 529, 531–38, 627, 638–643). These issues are consistent with Dr. Bailes' opinion that Plaintiff was unable to perform activities with his hands that require dexterity, that he was unable to perform any handling with either hand, and that he was extremely limited in fingering activities like picking or pinching. (*Id.*, Tr. 484–86, PAGEID #: 532–34). Further, the record is replete with documentation regarding Plaintiff's neuropathy in both his upper and lower extremities, consistent pain in his hands, and limitations in fingering and handling. (*See, e.g.*, *id.*, Tr. 259, PAGEID #: 397 (October 2012 treatment notes stating

13

Plaintiff "has neuropathy and has been in pain since 17"); *id.*, Tr. 386, PAGEID #: 424 (April 2013 surgical evaluation for Plaintiff's "persistent bilateral hand pain and numbness"); *id.*, Tr. 445, PAGEID #: 483 (October 2013 evaluation in which Plaintiff reported problems moving his hands, arms and fingers); *id.*, Tr. 470–71, PAGEID #: 508–09 (February 2014 treatment notes stating that Plaintiff has severe pain, as well as trouble with hands and wrists)). Moreover, examining physician Dr. Woodard opined that Plaintiff was limited in his ability to lift and grasp and had decreased motor function in his hands, coupled with severe pain. (*Id.*, Tr. 470–71, PAGEID #: 508–09). In other words, the record is full of objective evidence consistent with Dr. Bailes' opinion regarding Plaintiff's fingering and handling limitations. The ALJ erred when he concluded otherwise.

Second, the ALJ stated that Plaintiff's "limitations, particularly the handling and fingering limitations, are extreme and inconsistent with the claimant's . . . medical evidence of record, including the consultative internal medicine examination findings." (*Id.*, Tr. 33, PAGEID #: 71). However, while Dr. Parsley stated that Plaintiff could write and pick up coins, she ultimately opined that Plaintiff did have an impairment in grasping, gripping, and handling objects and decreased grip strength. (*Id.*, Tr. 454–57, PAGEID #: 492–95). Further, she acknowledged that Plaintiff was reliable, and reported difficulty gripping and holding onto objects. (*Id.*, Tr. 451, PAGEID #: 489). Thus, the ALJ's insinuation that Dr. Parsley's opinion entirely undermines Dr. Bailes' opinion is not supported by the record.

Third, the ALJ's statement that objective evidence showed an "improvement in functioning" mischaracterizes the evidence. (*Id.*, Tr. 33, PAGEID #: 71). Although Plaintiff reported improvement in his hands a week after his CTS surgery, he consistently reported that

the pain returned. (*See e.g.*, *id.*, Tr. 445, PAGEID #: 483 (reporting problems moving his arms, hands, and fingers in October 2013; *id.*, Tr. 451, PAGEID #: 489 (reporting problems holding on to objects and gripping, despite his surgeries earlier in the year); *id.*, Tr. 470–71, PAGEID #: 508–09 (treatment notes from February 2014 stating that Plaintiff has severe pain, as well as trouble with hands and wrists)). Additionally, the notion that medical records "reflect improvement in the claimant's diabetes" is incorrect. (*Id.*, Tr. 31, PAGEID #: 69). The ALJ stated that records dated September 3, 2014 describe the claimant's diabetes as "better." (*Id.* (citing 10F/4). Upon review, however, the September 3, 2014 records had the word "better" written on a blank space next to the word "Bolus/D," but nowhere in the notes was Plaintiff's diabetes described as better. (*Id.*, Tr. 491, PAGEID #: 529).

The rest of the ALJ's explanation similar falls short. The ALJ explained Dr. Bailes' opinion was given little weight, in part, because his fingering and handling limitations were inconsistent with his activities of daily living. (*Id.*, Tr. 33, PAGEID #: 71). The ALJ offered no elaboration of what activities he was referring to, but he had previously stated that "the claimant's allegations about the severity of his physical and mental impairments are inconsistent with his own reports of activities of daily living." (*Id.*, Tr. 32, PAGEID #: 70). In support of that contention, the ALJ cited the fact that Plaintiff was able to care for his children, assist with household chores, read, listen to music, visit with friends, maintain personal care, grocery shop, manage personal finances, and attend church. (*Id.*, Tr. 32, PAGEID #: 70). It is unclear, however, how the activities listed by the ALJ are incompatible with handling and fingering limitations. And Plaintiff's own testimony appears to be consistent with certain handling and fingering limitations, namely that his son must push the buttons while doing laundry, that

15

Plaintiff loses his grip on things, and that he is unable to wear shirts that require buttons. (*Id.*, Tr. 59–61, PAGEID #: 97–99). Consistent with his testimony, Plaintiff explained in his function report that he was unable to button things, he needed help giving himself shots, he could not use hands long enough to cook by himself, and he was unable to do any house or yard work (*Id.*, Tr. 258–59, PAGEID #: 296–97).

In sum, Dr. Bailes' opinion is consistent with the objective evidence of record. Additionally, the record citations and accompanying explanation the ALJ provided for discounting Dr. Bailes' 2014 letter are either inaccurate or do not undermine Dr. Bailes' opinion in the way the ALJ alleges. The ALJ therefore did not provide good reasons for assigning little weight to Dr. Bailes, and this error requires reversal. *See, e.g.*, *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 652 (6th Cir. 2011) ("While the Commissioner contends that the ALJ gave 'good reasons' for his conclusion, in our view they are unsupported by the record as a whole and are clearly erroneous."); *Brooks v. Soc. Sec. Admin.*, 430 F. App'x 468, 481 (6th Cir. 2011) (holding the ALJ failed to "present *good* reasons," *id.* at 483, where, "[o]f the four 'good reasons' that the ALJ can be understood to have offered for his decision ..., two are not supported by the record"); *Wisecup v. Astrue*, No. 3:10CV00325, 2011 WL 3353870, at *8 (S.D. Ohio July 15, 2011) ("[T]he ALJ, did not identify a single inconsistent piece of medical evidence and, although the ALJ referred to Dr. Kirkwood's own records, the ALJ did not identify a single inconsistency emerging from those records.").

In certain circumstances, however, an ALJ's failure to give good reasons for rejecting the opinion of a treating source may constitute *de minimis* or harmless error. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). *De minimis* or harmless error occurs: (1) if a

16

treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of the procedural safeguard of the good reasons rule even though an ALJ has not complied with the express terms of the regulation. *Id.* at 547. Because none of those factors apply here, there is no basis for finding harmless error.

### B. The Remaining Assignments of Error

Plaintiff also argues that the ALJ erred in his determination of his RFC and in his failure to consider his visual impairment. However, the Court's decision to recommend reversal and remand on the first assignment of error alleviates the needs for analysis on Plaintiff's remaining assignments of error. Nevertheless if the recommendation is adopted, the ALJ may consider Plaintiff's remaining assignments of error on remand if appropriate.

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations

to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: February 27, 2018                    /s/ Kimberly A. Jolson
                                           KIMBERLY A. JOLSON
                                           UNITED STATES MAGISTRATE JUDGE